**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 10-1476**

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

                  Plaintiff - Appellant,

        v.

CROMER FOOD SERVICES, INCORPORATED,

                  Defendant - Appellee.

**No. 10-1552**

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

                  Plaintiff - Appellee,

        v.

CROMER FOOD SERVICES, INCORPORATED,

                  Defendant - Appellant.

Appeals from the United States District Court for the District of South Carolina, at Greenville. Henry M. Herlong, Jr., Senior District Judge. (6:08-cv-03249-HMH)

Argued: January 26, 2011            Decided: March 3, 2011

Before MOTZ, KING, and GREGORY, Circuit Judges.

---

Vacated and remanded by unpublished opinion. Judge Gregory wrote the opinion, in which Judge Motz and Judge King joined.

---

**ARGUED:** Corbett Anderson, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Equal Employment Opportunity Commission. Sarah Ganss Drawdy, THE DRAWDY LAW FIRM, LLC, Anderson, South Carolina, for Cromer Food Services, Incorporated. **ON BRIEF:** P. David Lopez, General Counsel, Carolyn L. Wheeler, Acting Associate General Counsel, Lorraine C. Davis, Assistant General Counsel, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Equal Employment Opportunity Commission.

---

Unpublished opinions are not binding precedent in this circuit.

GREGORY, Circuit Judge:

This case involves alleged sexual harassment in violation of Title VII of the Civil Rights Act of 1964. Homer Ray Howard, an employee of Cromer Food Services ("CFS"), claimed to suffer a daily barrage of lewd comments and gestures by employees of CFS' biggest client. Rather than intervene, CFS told him there was nothing that could be done because the harassers were not under its control. Howard then filed a complaint with the Equal Employment Opportunity Commission ("EEOC"). The EEOC brought suit on his behalf. After discovery, CFS moved for summary judgment, which the district court granted. Because Howard has articulated sufficient facts to show that it would be reasonable to conclude his employer had actual or constructive notice of the harassment and failed to take any corrective action, we vacate and remand for trial.

I.

The following facts are undisputed unless otherwise noted. We recount them in the light most favorable to the EEOC, the nonmovant.

CFS is a food-stocking company that sells snacks and beverages in vending machines that it places on its clients' premises. Its biggest client is Greenville Hospital. Howard began working for CFS in July of 2006 as a route driver. He

3

worked on the second shift, 3:00 p.m. to 11:00 p.m., servicing the vending machines at Greenville Hospital. He had a regularized schedule where he would wind his way upstairs from the snack bar or cafeteria with scheduled stops in between.

Following an incident with a co-worker who left a note in the hospital canteen calling him gay, Howard began to be harassed on a daily basis at the hands of two hospital employees who referred to him as "Homo Howard." These two employees, John Mills and Andre McDowell, were housekeepers. Starting in early December 2006, they made unwanted sexual comments in nearly every encounter they had with Howard, including graphic discussions of oral sex that featured the two men groping themselves and propositioning Howard. Howard wanted to walk away but because the comments were made while he was stocking the vending machines, he could not leave without abandoning his duties. Mills and McDowell knew Howard's schedule and would wait for him at the machines so frequently that Howard felt "stalk[ed]." J.A. 78, 84-85, 100. Both men deny that they harassed Howard.

CFS failed to take adequate action to combat the harassment on behalf of the hospital employees. C.T. Cromer, the chairman of the company's Board of Directors, claims this was because he was unaware of the harassment or at least unaware of the scale on which it was occurring. Howard, however, contends that he

4

made both CFS and the hospital aware of what was going on as soon as it began. After the first incident, Howard spoke to his supervisor, Gregg Adams, telling him "there was some gentlemen at the hospital that were asking me homosexual questions, asking me was I gay." J.A. 89. Adams made light of the events, telling Howard to let it go, that the men were only joking. He did not ask for additional information to rectify the problem. The employee sexual harassment policy, which Howard signed upon being hired, requires employees to report harassment to the president of the company. Howard never reported the harassment to Brent Cromer, who was the head of the company, and testified that he did not even know who the president was. J.A. 119. The harassment policy also requires any employee "who becomes aware of any harassment of any employee by a non-employee [to] report such harassment to the president of Cromer Food Services." J.A. 63. Adams did not follow this directive.

In addition to Adams, Howard also reported the problem to his direct supervisor, Brian Tyner. Howard asked if there were a way to address the problem such as switching routes. Tyner's reply was "it was just a joke" and not to take things too seriously because "faggots are ignorant, retarded people, and Homer, I know you're not retarded." J.A. 89-90. The next week, Howard told another supervisor, Gary Roper, about the problem. J.A. 90. Roper replied that it was unfortunate that the

5

situation was being handled as it was, but that Adams had already dealt with it. Id.

As the harassment continued unabated, in late December or early January Howard spoke to Chet Cromer, one of the sons of the chairman of the Board of Directors and a manager with the company, and told him "what was going on." J.A. 91. Chet told Howard he would speak with his father, which he did. Id. That very night, Howard met with C.T., who was visibly upset by the situation. The first words out of his mouth were "[d]o you not realize this could cost me everything?" J.A. 92. He started to "rambl[e]" so much that Howard could not get a word in edgewise. J.A. 93. Howard does not remember whether or not he disclosed the names of his harassers in the meeting, but he knows he was never asked for their names. J.A. 130, 135. Howard testifies that he met with C.T. again in January to tell him the situation was getting worse. C.T.'s response, which directly contradicted the company harassment policy, was that he was not responsible for the hospital but only responsible for CFS employees.

As the harassment continued, Howard took progressively more drastic measures to stop it. In January, he reported the harassment directly to Greenville Hospital, speaking to an unidentified woman in the human resources department. Nothing happened as a result of that report. He also complained to Ronnie Galloway, Mills' and McDowell's supervisor, about their

6

actions.  Galloway took action and the harassment stopped for "[p]robably two days."  J.A. 125.  However, it quickly resumed. In response Howard remembers "constantly" telling Adams that the harassment at the hospital continued unabated.  J.A. 100.  He told Adams that the men were "following him" around the hospital and waiting for him to get there, as well as making lewd and vulgar comments about sex, but Adams only laughed it off and told him not to take the comments seriously.  Id.; J.A. 139. When Howard asked if he could switch to another second-shift route he believed was available that would not entail him going to the hospital, Adams told him to quit whining and that he was under contract at the hospital.  Adams' version of the facts differs from Howard's.  In his deposition testimony, Adams claimed he only remembered receiving one complaint from Howard in February of 2007 about a one-time incident, not a pervasive and hostile environment.  Adams did not report the complaint as he did not consider it to be sexual harassment.

On March 6, 2007, Howard decided to report the daily harassment to the EEOC.  CFS received a report of what happened shortly thereafter.  The same day, C.T. called Howard into his office and told him he got "this stupid letter from the EEOC." J.A. 102.  According to Howard, the meeting only lasted a few minutes and C.T. told Howard he did not want to hear about it. C.T.'s description of the meeting differs from Howard's.  In his

7

deposition, C.T. claims that he thought that Howard's failure to give specifics proved that he was lying about the details of the harassment. According to C.T., Howard's refusal to give names or to turn over the note suggests that he was making things up. Despite purportedly believing that Howard was a liar, C.T. acted to protect his employee. As a result of the details that C.T. claims emerged for the first time in this meeting, he decided that it was unacceptable for Howard to continue working at the hospital. Therefore, he immediately and in writing offered him a position on the first shift, which was from 4:00 a.m. to 3:30 p.m. Mondays through Fridays, with a thirty-minute unpaid lunch break.

The hours worked as part of the first shift increased to fifty-five per week from forty hours per week. The pay was $10 per hour for the first forty hours and $15 per hour thereafter with weekly pay coming to $625. Because overtime was mandatory, the effective pay rate was $11.26 per hour. By contrast, and according to the EEOC's calculations, the pay for Howard was $12.50 per hour for his original second shift position. This calculation includes the $100 weekly advance on his annual bonus that was paid on top of his $400-a-week salary and which he would only be able to keep if he worked at the company for a year. CFS disputes whether the advance is properly included in the calculations, and alleges that his actual pay was $10 per

8

hour. Regardless of the pay, Howard declined to take the new shift, which allegedly conflicted with his childcare responsibilities. Because the shift was a "take it or leave it" offer, Howard claims he was terminated as a result of his choice.

The EEOC brought suit shortly thereafter. The district court in South Carolina granted summary judgment to the defendant. In reaching this conclusion, the district court rejected a magistrate judge's recommendation that it deny summary judgment. Specifically, the district court found that although there was a dispute of fact regarding <u>when</u> CFS was aware of harassment, this dispute was immaterial because CFS lacked the requisite details regarding the harassment to take curative action. In reaching this conclusion, the district court focused on one snippet of Howard's deposition testimony, where Howard said "no" when he was asked if he provided details of the harassment to Adams or other employees of CFS. J.A. 139-40, 18. However, other evidence from the record made plain that Howard attempted on numerous other occasions to alert CFS to the nature of the harassment, and had effectively been stonewalled. J.A. 130 ("Q: Do you think you could have given [C.T.] more information so that he could go to Greenville Hospital and file a formal complaint? . . . A: No. Because C.T. already had it in his mind, it's not his problem."); J.A. 105 ("What details

9

did you tell [C.T.] about the harassment? . . . A: With C.T., I was explaining to him that the gentlemen are very aggressive, very vulgar, very sexually-oriented, stalking. And that's about as far as you can get."); J.A. 100 ("Q: Did you tell [Gregg] the details? A: I told him a couple of incidents where 'They're following me around. They're stalking me in certain areas of the hospital, waiting for me to get there.' And as any other conversation, he thought it was funny."); J.A. 89 ("Q: What did you say to [Gregg]? A: And I told him there was some gentlemen at the hospital that were asking me homosexual questions, asking me was I gay. And I told him I didn't find it very pleasing. And his comment was, 'Homer, it was just a joke. Let it go.' And I said I didn't find it a joke. And he said, 'It's time to go, get on your route, and head on out.'"). Further, according to Howard's testimony, none of the managers to whom he reported the harassment asked for names or details. J.A. 135, 140-41.[1]

---

[1] At oral argument, counsel for the EEOC contended that Howard stated that if asked for the names he would have provided them. Counsel did not provide a cite to the Joint Appendix, and, after scouring the record, we find no such statement.

## II.

We review a grant of summary judgment <u>de novo</u>, applying the same test as the district court. <u>EEOC v. Fairbrook Med. Clinic, P.A</u>, 609 F.3d 320, 327 (4th Cir. 2010) (citations omitted). Importantly, we "view the facts and draw reasonable inferences in the light most favorable to the non-moving party, here the EEOC." <u>Id.</u> at 322 (internal quotations omitted). That means that evidence supporting CFS should be disregarded unless it is "uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses." <u>Reeves v. Sanderson Plumbing Prods.</u>, 530 U.S. 133, 151 (2000). Further, the court may not make credibility determinations or weigh the evidence, a function that is reserved for the jury. <u>Id.</u> at 150. Importantly, this means considering the evidence as a whole rather than zooming in and focusing on deposition testimony that is taken out of context or is viewed in isolation.

## III.

To make out a claim for sexual harassment, the plaintiff must establish four elements: (1) the harassment was unwelcome; (2) was based on sex; (3) was sufficiently severe or pervasive to alter conditions of employment and create an abusive atmosphere; and (4) was imputable to the employer. <u>EEOC v.</u>

11

Central Wholesalers, Inc., 573 F.3d 167, 174-75 (4th Cir. 2009).

Because the fourth element is the only one challenged, it is the only one we address here.

The Fourth Circuit has yet to consider whether an employer may be liable for the activities of non-employees in a claim for sexual harassment. Other Circuits to address the issue have adopted a negligence standard, finding that an employer can be liable if it took no steps to protect its employees and if it had actual or constructive knowledge of the situation. See Dunn v. Washington County, 429 F.3d 689, 691 (7th Cir. 2005) (employers, which have an "arsenal" of tools at their disposal, can be liable for the acts of independent contractors if they fail to take corrective action); Galdamez v. Potter, 415 F. 3d 1015, 1022 (9th Cir. 2005) (employer can be liable for third parties if it ratifies their actions by failing to act); Watson v. Blue Circle, Inc., 324 F.3d 1252, 1258 n.2 (11th Cir. 2003) (employer can be liable for acts of its customers if it knew or should have known of actions); Turnbull v. Topeka State Hosp., 255 F.3d 1238, 1244 (10th Cir. 2001) (adopting a negligence standard in this context). EEOC regulations are also to the point, providing that an employer "may also be responsible for the acts of nonemployees, with respect to sexual harassment of employees in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct

12

and fails to take immediate and appropriate corrective action." 29 C.F.R. § 1604.11(e) (internal citations and quotations omitted). The analysis is very similar to the standard used by this Circuit in the context of harassment of co-workers. See Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 333-34 (4th Cir. 2003) ("The employer may be liable in negligence if it knew or should have known about the harassment and failed to take effective action to stop it.") For the purposes of the instant litigation, and because both parties urge us to do so, we adopt a negligence standard commensurate with the above precedents. Thus CFS is liable if it knew or should have known of the harassment and failed to take appropriate actions to halt it.

Appellee argues, and the district court agreed, that CFS did not have actual or constructive knowledge of the harassment because the complaints that Howard lodged were vague and insufficiently detailed for CFS to take action. Further, it argues, Howard failed to follow the sexual harassment protocol that required incidents be made known to the company president. But such reasoning ignores the clear evidence in the record that Howard tried to communicate the nature and extent of the harassment and was effectively ignored by all levels of CFS management who scoffed at him and told him to quit being such a "crybaby." J.A. 140. If Howard's deposition testimony is credited, as it must be, then whatever paucity of details that

13

resulted from his complaints are due to the company's own decision not to listen to him. For example, he mentions that he tried to tell C.T. but could not get a word in edgewise. He also reported the incidents numerous times to his supervisor, Adams, but was rebuffed at every turn. Furthermore, Howard did communicate details about the harassment, including recounting a couple of incidents, to Adams, who laughed at him and took it as a joke despite Howard's clear sentiments to the contrary. And, crediting Howard's testimony, the company also failed to ask him follow-up questions or request the names of the harassers.

In this situation, it is hardly fair to fault Howard for failing to communicate more information about the incidents or for ineffectively conveying their gravity. To do so would be a perversion of the law of anti-harassment, which although requires notice to the employer, does not and should not require it to be pellucid. Even if it is true that Howard refused to give names, CFS still had a duty to investigate or take other measures to combat the harassment. Indeed, other employees reported problems to the hospital which were solved, indicating that such a solution was available here as well. Further, the fact that the hospital took some steps to combat the harassment suggests that Howard was, in fact, communicating a sufficient degree of detail to facilitate curative action.

Appellee cites Madray v. Public Supermarkets, Inc., 208 F.3d 1290, 1300 (11th Cir. 2000), for the proposition that once the employer has "promulgated an effective anti-harassment policy and disseminated that policy and associated procedures to its employees . . . it is incumbent upon the employees to utilize the procedural mechanisms established by the company specifically to address problems and grievances." Id. (citations and quotations omitted). There, the Eleventh Circuit held that an employee who had not followed the anti-harassment policy had not effectively put the company on notice. Id. This is not the approach taken by the Fourth Circuit. In Ocheltree, this Court found that claims of harassment could not be avoided through the adoption of a "see no evil, hear no evil" strategy. 335 F.3d at 334. Rather, knowledge can be imputed to an employer if a "reasonable [person], intent on complying with Title VII, would have known about the harassment." Id. Further, knowledge may be constructive if the employer does not provide reasonable procedures to register complaints. Id.

On the facts here, a reasonable person would have known about the harassment given Howard's vocal and vociferous complaints to practically anyone who would listen. Furthermore, the company policy obligates those who become aware of harassment to report it up the chain of command, a protocol which fell by the wayside. See Williamson v. City of Houston,

15

148 F.3d 462, 466 (5th Cir. 1998) (duty to report up sufficient to trigger liability on part of the company); Restatement (Second) of Agency § 275 (1958) ("the principal is affected by the knowledge which an agent has a duty to disclose to the principal or to another agent of the principal to the same extent as if the principal had the information."). Finally, the company's policy itself is somewhat questionable in requiring the employees of a 100-person cadre to report directly to the president. An employee might be easily intimidated and fail to report it such that the company would be technically insulated from liability. We do not find such a result just or proper. EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 320 (4th Cir. 2008) ("[e]vidence of repeated complaints to supervisors and managers creates a triable issue as to whether the employer had notice of the harassment."). Finally, as here, an employee may lack knowledge of the higher-ups; we do not think such ignorance is justification for inaction on the part of the company sued.

CFS points to a snippet of Howard's deposition: "Q: Did you ever report your problem to the president of the company? A: No. No, I didn't." J.A. 119. But this needs to be placed in context because Howard explains that C.T. Cromer was out of town for the Christmas holidays, and that's why he reported the

16

incident to Adams in his stead.[2]  The evidence when viewed in the light most favorable to the EEOC showed that numerous individuals laughed at and belittled his complaints or adopted an ostrich-in-the-sand approach.  J.A. 89  ("Homer, it was just a joke.  Let it go.").

CFS next contends that it acted promptly to protect Howard as soon as it had sufficient information about what was occurring in the hospital.  In other words, the offer to transfer Howard from second shift to first shift, which would have changed his route not to include Greenville Hospital, was enough to fulfill its obligations to him.  But the record does not include evidence that the shift would have allowed Howard to drive his young child to hospital appointments, his stated reason for preferring a second-shift slot.  Even if it is true that he could have worked around it, as CFS implies, if it still resulted in Howard being worse off, it is unacceptable as a remedial measure.  See Guess v. Bethlehem Steel Corp., 913 F.2d 463, 465 (7th Cir. 1990) ("A remedial measure that makes the victim of sexual harassment worse off is ineffective per se.").  Furthermore, corrective action is not enough if it is too

---

[2] It should be noted that while technically Brent Cromer was CFS' president, C.T. Cromer, the chairman of the Board, essentially ran the show as Brent Cromer admitted in his deposition.  JA 252.  Thus, Howard was reasonably confused regarding to whom he should report the harassment.

little, too late.  Id.  That is exactly the case here.  Howard endured months of inaction between when he first alerted his employer of the problem, in December, to its eventual offer to transfer him, which came in late March.  Indeed, there were many alternatives that may have been available to the employer that suggest themselves when the facts are viewed in the light most favorable to the EEOC and that may be substantiated at trial.  Perhaps, for example, CFS could have availed itself of its relationship with Greenville Hospital and asked the management there to investigate and, if proper, to discipline the relevant employees.  Alternatively, it could have petitioned its employees who were on second shifts to see if they would switch routes with Howard.  But no matter how the facts are spun, CFS' actions were hardly an effective remedy.

IV.

The next question, closely related to the previous, is whether a reasonable jury could find that CFS' decision to switch Howard from the second to first shift constituted unlawful retaliation for his decision to file an EEOC complaint. In order to support a claim for retaliation, there must be sufficient evidence that (1) the employee engaged in a protected activity; (2) the employer acted adversely; and (3) a causal connection between (1) and (2) exists.  Holland v. Washington

18

<u>Homes, Inc.</u>, 487 F.3d 208, 218 (4th Cir. 2007). CFS argues on appeal that its decision to transfer was not adverse; it does <u>not</u> claim that there was no causal connection between the two. Therefore, we only address the second prong here.

In <u>Burlington Northern v. Santa Fe Railway Co.</u>, 548 U.S. 53 (2006), the Supreme Court established the framework for what constitutes adverse action. It held that it is any action that might "dissuade a reasonable worker from making or supporting a charge of discrimination." <u>Id.</u> at 57. Materiality must be considered from the vantage point of someone in the plaintiff's position who shares "at least some individual characteristics with the actual victim" such as "age, gender, and family responsibilities." <u>Id.</u> at 79.

Here, a jury could easily conclude that the actions taken by CFS were adverse. First, there is a dispute of material fact over whether Howard's salary per hour increased or decreased. According to the EEOC, Howard was paid $11.26 per hour for the new shift but $12.50 per hour for his original second shift position. Viewing these calculations in the light most favorable to Howard, his pay per hour decreased and his number of hours per week increased. Further, he had childcare obligations that were interfered with. As a result, someone in his position could find the material effects of the new shift adverse.

19

V.

The final question is whether the district court abused its discretion by denying CFS' attorneys fees. Because we vacate the district court as to liability, there is no prevailing party at this point in the litigation. Therefore, there is no need to consider the attorneys' fees.

VI.

For the foregoing reasons, the decision of the district court is

VACATED AND REMANDED.