Filed:  May 1, 2014

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 13-1481**

(5:10-cv-00522-BR)

LORI FREEMAN,

        Plaintiff – Appellant,

    v.

DAL-TILE   CORPORATION,   d/b/a   Dal-Tile   Distribution, Incorporated, d/b/a Dal-Tile Services, Incorporated,

        Defendant – Appellee,

    and

VOSTONE INCORPORATED; TIMOTHY KOESTER,

        Defendants.

O R D E R

The Court amends its opinion filed April 29, 2014, as follows:

On page 18, second paragraph, line 3 -- "Freeman used racial slang" is corrected to read "Koester used racial slang."

For the Court – By Direction

/s/ Patricia S. Connor
Clerk

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 13-1481

LORI FREEMAN,

Plaintiff – Appellant,

v.

DAL-TILE CORPORATION, d/b/a Dal-Tile Distribution, Incorporated, d/b/a Dal-Tile Services, Incorporated,

Defendant – Appellee,

and

VOSTONE INCORPORATED; TIMOTHY KOESTER,

Defendants.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. W. Earl Britt, Senior District Judge. (5:10-cv-00522-BR)

Argued: January 29, 2014          Decided: April 29, 2014

Before TRAXLER, Chief Judge, and NIEMEYER and SHEDD, Circuit Judges.

Reversed in part, affirmed in part, and remanded by published opinion. Judge Shedd wrote the majority opinion, in which Chief Judge Traxler joined. Judge Niemeyer wrote an opinion concurring in part and dissenting in part.

**ARGUED:** Anne Warren King, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Appellant. Kristine Marie Sims, CONSTANGY, BROOKS & SMITH, LLP, Winston-Salem, North Carolina, for Appellee. **ON BRIEF:** Brian Wolfman, Institute for Public Representation, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Appellant. William J. McMahon, IV, CONSTANGY, BROOKS & SMITH, LLP, Winston-Salem, North Carolina, for Appellee.

SHEDD, Circuit Judge:

Lori Freeman appeals a grant of summary judgment in favor of her former employer, Dal-Tile Corporation, on her claims of racial and sexual hostile work environment, constructive discharge, and common law obstruction of justice. For the reasons discussed more fully below, we reverse the grant of summary judgment on the hostile work environment claims and remand them for further consideration. We affirm the grant of summary judgment on the claims of constructive discharge and common law obstruction of justice.

I.

Dal-Tile Corporation manufactures, distributes, and markets ceramic tile and natural stone products.[1] It operates eight manufacturing facilities, five regional distribution centers, and over 250 sales service centers, including both stone yards and tile showrooms.

In June 2008, Dal-Tile acquired the assets of Marble Point, Inc., a stone yard located in Raleigh, North Carolina, from owner Marco Izzi. Dal-Tile incorporated this newly-acquired

---

[1] All facts discussed in this opinion are presented in the light most favorable to Freeman, the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."); Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 958 (4th Cir. 1996).

operation into a sale-service center organization (the "Stoneyard"). After this sale, Izzi purchased an ownership interest in VoStone, Inc., a Raleigh-based kitchen and bath remodeling center. A significant percentage of VoStone's business involved working with Dal-Tile.

In August 2006, Freeman began working as a receptionist for Dal-Tile's predecessor, Marble Point. She was hired on a temporary basis through a staffing agency, but after six months, she joined Marble Point as a permanent employee. Throughout her tenure at Marble Point, Freeman reported to Izzi and to assistant manager Sara Wrenn. Following Dal-Tile's acquisition of Marble Point, Freeman became a Dal-Tile employee,[2] and Wrenn continued to be her supervisor. Freeman's first position with Dal-Tile was General Office Clerk. Over time, Freeman began interacting more frequently with Dal-Tile's customers, and she effectively functioned as a Customer Service Representative. In

---

[2] In June 2008, Dal-Tile's Regional Human Resources Manager visited the Stoneyard and held a group meeting with the employees to review Dal-Tile's policies and employee benefits programs. At that time, Freeman received Dal-Tile's employee handbook, including its policy prohibiting harassment and discrimination. Dal-Tile's policy against harassment, which was in place throughout Freeman's tenure, states that Dal-Tile will not tolerate harassment based on an individual's sex, race, or other protected characteristics. It also defines the sort of conduct prohibited, provides avenues for employees to report harassment to the company, and prohibits retaliation against individuals who raise complaints under the policy.

4

May 2009, she was promoted to the role of Sales Consultant. In November 2009, Freeman's position was reclassified to Customer Service Representative.

The harassment claims at issue are based on the behavior of Timothy Koester, an independent sales representative for VoStone. Freeman usually interacted with Koester more than once a day while he was conducting business with Dal-Tile on behalf of VoStone.

About two weeks after Freeman became a temporary employee with Marble Point in August 2006, she overheard Koester as he walked into Wrenn's office and, referencing a photograph of two former employees, asked Wrenn and another employee: "[H]ey, who are these two black b****es[?]" J.A. 76. After the incident, Freeman asked Wrenn about Koester, inquiring: "[W]ho was he and what was his deal[?]" J.A. 77. Wrenn replied: "[H]e's an asshole, but I don't think he'll do it again." Id. The next day, Freeman told Koester "how uncomfortable and demeaning that made [her] feel," and she asked him not to use that sort of language anymore. J.A. 75.

Freeman also recalled Koester making comments about women he had been with the night before. On one occasion, Koester showed her a photograph of a naked woman on his cell phone and remarked: "[T]his is what I left in my bed to come here today." J.A. 80. On a different occasion, Freeman overheard Koester

5

talking with one of her co-workers, Jodi Scott, about photographs of Scott's daughters that were displayed in Scott's office. According to Freeman, Koester told Scott: "I'm going to hook up with one your daughters," or "I'm going to turn one of your daughters out." J.A. 136. Scott replied: "[Y]ou better stay away from my kids," or "[D]on't talk to me about my kids." Id.

In a different instance, Koester passed gas on Freeman's phone. Koester was using Freeman's office phone, and she was standing there waiting for him to finish his conversation. Before Koester hung up the phone, he held it to his buttocks and passed gas on it. J.A. 81. Wrenn was present for this incident. Freeman immediately began crying and had to leave the room to calm down. J.A. 82.

In June 2009, Koester called Freeman about covering a customer appointment for him because he had been partying the night before. Koester indicated that he could not come into the office, saying: "I'm just too f***ed up, don't take offense, but I'm as f***ed up as a n****r's checkbook." J.A. 99. Freeman told Wrenn about Koester's comment that same day, but Wrenn just "scoffed and shook her head and put her head back down and continued on with trying to pick the nail polish off of her nails . . . ." J.A. 102. Freeman also reported Koester's remark to James Vose, one of the co-owners of VoStone. Vose laughed and

said: "[Y]ou got to admit that's kind of funny, just do what I do and hit him because he's an asshole." J.A. 107.

Subsequently, on July 29, 2009, Koester called Dal-Tile's general office line, and Freeman answered the phone. Koester had his six-year-old daughter, Angelina, with him at the time. Freeman, who knew Angelina, asked Koester to tell Angelina that she said "hi." Instead, Koester put Freeman on speaker phone so that she and Angelina could talk with one another. Freeman then heard Angelina ask: "Daddy, who's that[?]" J.A. 111. Koester replied: "[T]hat's the black b**** over at Marble Point." Id. Freeman "immediately became very irate." Id. She told Koester: "[D]on't you ever call me a black b**** as long as you live." Id. Koester responded: "[O]h, word." Id. Freeman promptly told Wrenn about Koester's comment, but Wrenn appeared disinterested and continued a conversation that she had been having with some other co-workers.

In addition to these specific incidents, Freeman and other co-workers testified more generally that Koester frequently made inappropriate sexual comments. Freeman testified that Koester "was always coming in making some sort of lewd comments." J.A. 78. She also stated that "maybe two or three times a week" she would have to correct Koester and tell him not to say something inappropriate. J.A. 79. Freeman explained that Koester would "come in to discuss what he did the night before with whatever

7

woman he was with and [Freeman] would tell him [she didn't] want to hear it." J.A. 80. Wrenn confirmed this, stating that "he liked to brag about his, you know, evening excursions, or his weekend excursions. . . . [T]here were times where he would say something about what he did the night before that had sexual content to it." J.A. 269. According to Wrenn, "[h]e always made comments about women." J.A. 274. Wrenn also testified that Koester used the word "b****" in the office, such as "You should have seen these hot b****es I met last night." J.A. 268. Jodi Scott testified that Koester used the word "b****" "[u]sually about every time that he came in." J.A. 381–82. Wrenn even referred to Koester as a "pig." J.A. 253. Koester himself also admitted he made sexual comments in the office. J.A. 325.

Freeman and other co-workers also testified generally about Koester's inappropriate racial remarks. For instance, Koester used racial "slang" such as "Yo, b****" and "How's my b****es?" when talking to the female employees. J.A. 384–85. Jodi Scott testified that Koester used racial language every day that he came into the office. J.A. 386. Koester himself admitted to using African-American type slang. J.A. 325. Cathy Diksa, a human resource manager, explained that according to manager Wrenn, Koester used racial language in the office. J.A. 217. For instance, following the election of Barack Obama in 2008, Koester said to Freeman, "[Y]ou guys won." J.A. 355. Koester

himself testified that he probably made comments about taking "beautiful black girls" home with him. J.A. 343. He also admitted that he made comments that were "[m]aybe racially inappropriate." J.A. 344.

Following the most recent "black b****" incident in July 2009, Freeman reported Koester's remarks to Cathy Diksa in human resources after Wrenn ignored her complaint. Diksa initially promised Koester would be permanently banned from the facility. However, the company lifted the ban and instead prohibited Koester from communicating with Freeman. He was allowed on the premises but had to coordinate all on-site meetings through Wrenn.

Freeman was so upset about the prospect of being forced to interact with Koester that she took a medical leave of absence beginning September 2, 2009. During this time she received treatment for depression and anxiety. Freeman returned to work around November 19, 2009. Wrenn informed Freeman that Koester no longer worked for VoStone but for another kitchen and bath fabricator. Wrenn told Freeman that Koester would continue to call Wrenn's cell phone and not the general office line if he needed to conduct business with Dal-Tile.

On December 7, 2009, Freeman notified Dal-Tile that she was resigning from her position effective December 11, 2009. Freeman testified that she resigned because the depression and anxiety

9

became too much for her; she was constantly worried she would encounter Koester at work. J.A. 179–80.

In October 2009, while on medical leave, Freeman filed a charge with the Equal Employment Opportunity Commission ("EEOC"), asserting that Dal-Tile had subjected her to discrimination based on her sex and race.

After receiving a right to sue letter, Freeman brought this action in the Eastern District of North Carolina, asserting claims for racial hostile work environment under 42 U.S.C. § 1981; racial and sexual hostile work environment under Title VII of the Civil Rights Act of 1964; discriminatory discharge under 42 U.S.C. § 1981; and obstruction of justice under North Carolina common law.[3] The obstruction of justice claim is based on the allegation that Dal-Tile failed to issue a litigation hold on e-mails after it received her October 28, 2009 EEOC charge and thus destroyed a significant number of e-mails pursuant to its email retention policy.

Following discovery, in May 2012, Dal-Tile filed a motion for summary judgment. The district court granted this motion. Freeman v. Dal-Tile Corp., 930 F. Supp. 2d 611 (E.D.N.C. 2013).

---

[3] She also asserted retaliatory demotion and discharge claims under 42 U.S.C. § 1981, but she does not appeal the dismissal of those claims.

First, the district court held that in regard to the racial and sexual hostile work environment claims, Freeman did not present sufficient evidence to create a genuine dispute of material fact on the issue of whether the harassment was objectively severe or pervasive. However, the district court noted "that plaintiff subjectively perceived the alleged racial and sexual harassment to be abusive." Id. at 628.

Second, the district court ruled that even if the harassment was found to be objectively severe or pervasive enough to alter Freeman's work conditions, Dal-Tile would still be entitled to summary judgment because Freeman could not establish that liability should be imputed to Dal-Tile. The district court used a negligence standard, adopted from an unpublished opinion of this Court, in which "an employer is liable [for the actions of a third party] 'if it knew or should have known of the harassment and failed to take appropriate actions to halt it.'" Id. at 638 (quoting EEOC v. Cromer Food Servs., Inc., 414 F. App'x 602, 606 (4th Cir. 2011)).

Applying this standard, the district court held that Dal-Tile did not have actual or constructive knowledge of the harassment because "no reasonable fact-finder could conclude that plaintiff's statement[s] to Wrenn constituted a complaint, either formal or informal." Id. at 639. Further, the district court noted that "even if [it] were to assume arguendo that the

11

. . . remarks that plaintiff made to Wrenn could somehow be construed as complaints, it is undisputed that plaintiff knew there were additional avenues that she could have pursued if she was unsatisfied with Wrenn's response." Id. at 640. In the second inquiry of the negligence analysis, whether the employer's response was appropriate, the district court ruled that Dal-Tile's response to Koester's behavior was adequate as a matter of law.

Third, the district court held that Freeman was not constructively discharged but, rather, voluntarily resigned. The district court noted that Freeman was "unable to show that anyone at Dal-Tile acted deliberately with an unlawful discriminatory intent in order to force her to resign either before or after she returned from medical leave." Id. at 647.

Lastly, the district court ruled that Freeman's North Carolina obstruction of justice claim failed as a matter of law. The district court stated that "the evidence does not support a finding that anyone at Dal-Tile intentionally destroyed emails in order to keep plaintiff from proceeding with a legal claim." Id. at 648.

## II.

This Court "review[s] the district court's grant of summary judgment de novo, applying the same legal standards as the district court and viewing the facts and inferences drawn from

12

the facts in the light most favorable to . . . the nonmoving party." Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 958 (4th Cir. 1996).

On appeal, Freeman argues 1) a reasonable jury could conclude that she was subjected to a racially and sexually hostile work environment; 2) a reasonable jury could find that liability for Koester's harassment is imputable to Dal-Tile; 3) a reasonable jury could find that she was constructively discharged; and 4) North Carolina common law requires only general intent not specific intent for obstruction of justice claims, and the destruction of emails here meets this standard. We address each in turn.

### III.

Freeman first argues the district court erred in granting summary judgment on her hostile work environment claims. Under Title VII, "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2. "Since an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action." EEOC v. R & R Ventures, 244 F.3d 334, 338 (4th

13

Cir. 2001) (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 73 (1986)).

For this Court to reverse the district court's grant of summary judgment to Dal-Tile on her hostile work environment claims, Freeman must establish that the evidence, viewed in her favor,

> would allow a reasonable jury to conclude that the harassment was (1) unwelcome, (2) based on [Freeman's] gender or race, (3) sufficiently severe or pervasive to alter the conditions of her employment and create an abusive atmosphere, and (4) imputable to [Dal-Tile].

EEOC v. Cent. Wholesalers, Inc., 573 F.3d 167, 175 (4th Cir. 2009) (citing EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 313–14 (4th Cir. 2008)).

First, Freeman must establish that a reasonable jury could conclude that the sex- or race-based harassment was unwelcome. As discussed above, Freeman complained of her harassment to Wrenn, human resources, and Koester himself. She told Koester repeatedly to stop making such crude and demeaning comments. She cried in both Wrenn and Koester's presence over the harassment. She eventually was treated for depression and anxiety because of it. Based on this evidence, we believe that a reasonable jury could find that both the sex- and race-based harassment were unwelcome.

14

Second, Freeman must show that a reasonable jury could find that the harassment was based on her sex or race. The evidence shows that Koester used the word b**** in the office almost every time he came in, often discussed his sexual encounters with women, showed naked pictures of women to Freeman and others, frequently made "lewd" comments, discussed having sex with a co-worker's daughters, and called Freeman a "black b****," among other things. Based on this evidence, a reasonable jury could find that the harassment was based on Freeman's sex. See, e.g., Forrest v. Brinker Intern. Payroll Co., 511 F.3d 225, 229 (1st Cir. 2007) (stating that a "raft of case law" "establishes that the use of sexually degrading, gender-specific epithets, such as . . . 'b****,' . . . has been consistently held to constitute harassment based upon sex").

Regarding race, Koester discussed bringing "black girls" home with him, used racial slang in the office on a daily basis, said "black b****" at least twice (once directed at Freeman), told Freeman he was "as f***ed up as a n****r's checkbook," and admitted to maybe using "racially inappropriate" language in the office. In light of this evidence, a reasonable jury could find that Koester's harassment was also based on Freeman's race. See Spriggs v. Diamond Auto Glass, 242 F.3d 179, 185 (4th Cir. 2001) (describing the use of the word "n****r" as an "unambiguously

15

racial epithet" (quoting <u>Rodgers v. Western-Southern Life Ins. Co.</u>, 12 F.3d 668, 675 (7th Cir. 1993))).

Third, Freeman must show that a reasonable jury could find that the sex- or race-based harassment was so severe or pervasive as to alter the conditions of her employment and create an abusive or hostile atmosphere. "This element of a hostile work environment claim has both subjective and objective parts." <u>Cent. Wholesalers, Inc.</u>, 573 F.3d at 175 (citing <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 21–23 (1993)). Freeman thus "must show that [she] did perceive, and a reasonable person would perceive, the environment to be abusive or hostile." <u>Id.</u>

Regarding the subjective component, the district court stated, and we agree, that the evidence supports a finding that Freeman subjectively perceived both types of harassment to be abusive or hostile. As discussed above, Freeman complained about the harassment to her supervisor, human resources, and Koester himself. She cried at work in front of co-workers because of the harassment. The evidence also shows the harassment interfered with her ability to work, as she was often distracted by Koester's inappropriate behavior and the stress that she felt from having to interact with him. Freeman ultimately had to take medical leave and seek treatment for depression and anxiety because of Koester's harassment. In light of this evidence, we conclude that a reasonable jury could find that Freeman found

16

the harassment subjectively hostile or abusive. See Cent. Wholesalers, Inc., 573 F.3d at 176 (finding a triable issue of fact on subjective perception of hostility where plaintiff "complained about both types of harassment and stated that she found such harassment objectionable" and "that the harassment caused her emotional distress"); Harris v. Mayor & City Council of Baltimore, 429 F. App'x 195, 202 (4th Cir. 2011) (finding a triable issue of fact on subjective perception of hostility where plaintiff presented evidence that she complained of harassment, suffered from a depressive disorder because of her work experiences, and was seen crying at work by a co-worker).

Next we must determine whether the harassment was objectively severe or pervasive.

> This objective inquiry "is not, and by its nature cannot be, a mathematically precise test." Harris, 510 U.S. at 22. "Rather, when determining whether the harassing conduct was objectively severe or pervasive, we must look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Sunbelt, 521 F.3d at 315 (quotation marks omitted). "[N]o single factor is" dispositive, Harris, 510 U.S. at 23, as "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed," Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 82 (1998).

Cent. Wholesalers, Inc., 573 F.3d at 176.

17

Here, the record is replete with evidence of frequent abusive behavior by Koester during Freeman's tenure with Marble Point and Dal-Tile. Regarding the sex-based harassment, Koester repeatedly used the word "b****" in the office, inquired about two "black b****es" he saw in a picture, called Freeman a "black b****," passed gas on Freeman's phone, and often discussed his sexual experiences with women, including showing co-workers naked pictures on his phone. He made "lewd" comments on a regular basis, and was described by Wrenn as a "pig." Freeman has certainly established a triable issue on whether the sex-based harassment was objectively severe or pervasive. See, e.g., Cent. Wholesalers, Inc., 573 F.3d at 176 (finding that the frequent use of the word "b****," coupled with both displays of scantily clad or naked women in the office and inappropriate sexual jokes, was sufficient to create a triable issue of fact on the issue of objective hostility).

Based on the evidence, a reasonable jury could also find the race-based harassment was objectively severe or pervasive. Koester used racial slang in the office on a daily basis. He inquired about two "black b****es" he saw in a picture. He called Freeman a "black b****" in the presence of his young daughter. He discussed bringing home black women to have sex with them. He told Freeman he was "as f***ed up as a n****r's checkbook."

To begin, "the word 'n****r' is pure anathema to African-Americans," Spriggs, 242 F.3d at 185, as it should be to everyone. Moreover, as we have stated before, "[w]e cannot ignore . . . the habitual use of epithets here or view the conduct without an eye for its cumulative effect. Our precedent has made this point repeatedly." Sunbelt Rentals, Inc., 521 F.3d at 318. Therefore, when viewing the circumstances as a whole, we find the use of the word "n****r," coupled with the on-going offensive racial talk, use of the term "black b****" on more than one occasion (once directed at a black employee), and sexual talk regarding black women, is sufficient evidence for a reasonable jury to find the race-based harassment was objectively severe or pervasive.

Lastly, Freeman must establish a "basis for imposing liability" on Dal-Tile for the sex- or race-based harassment. Gilliam v. S.C. Dep't of Juvenile Justice, 474 F.3d 134, 142 (4th Cir. 2007). The district court adopted a negligence standard for analyzing an employer's liability for third-party harassment under Title VII. This Court has not yet adopted this standard in a published opinion, but we do so today.[4] Similar to

---

[4] Other circuits to address the issue have also adopted a similar standard. See Dunn v. Washington Cnty., 429 F.3d 689, 691 (7th Cir. 2005)("[T]he plaintiff bears the burden of showing that the employer knew of the problem (usually though not always this requires the employee to show that a complaint was made) (Continued)

19

the reasoning we set forth for employer liability for co-worker harassment, "an employer cannot avoid Title VII liability for [third-party] harassment by adopting a 'see no evil, hear no evil' strategy.'" Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 334 (4th Cir. 2003) (en banc). Therefore, an employer is liable under Title VII for third parties creating a hostile work environment if the employer knew or should have known of the harassment and failed "to take prompt remedial action reasonably calculated to end the harassment." Amirmokri v. Baltimore Gas & Elec. Co., 60 F.3d 1126, 1131 (4th Cir. 1995) (quoting Katz v. Dole, 709 F.2d 251, 256 (4th Cir. 1983)) (internal quotation marks omitted) (applying this standard to co-worker harassment).

---

and that the employer did not act reasonably to equalize working conditions once it had knowledge."); Galdamez v. Potter, 415 F.3d 1015, 1022 (9th Cir. 2005) ("An employer may be held liable for the actionable third-party harassment of its employees where it ratifies or condones the conduct by failing to investigate and remedy it after learning of it."); Watson v. Blue Circle, Inc., 324 F.3d 1252, 1259 (11th Cir. 2003) ("When, as in this case, the alleged harassment is committed by co-workers or customers, a Title VII plaintiff must show that the employer either knew (actual notice) or should have known (constructive notice) of the harassment and failed to take immediate and appropriate corrective action."); Turnbull v. Topeka State Hosp., 255 F.3d 1238, 1244 (10th Cir. 2001) (holding that "an employer may be responsible for sexual harassment based upon the acts of nonemployees" under a "negligence analysis").

This Court has also adopted this negligence standard in a prior unpublished opinion. See EEOC v. Cromer Food Servs., Inc., 414 F. App'x 602, 606–07 (4th Cir. 2011), and both parties agree that a negligence analysis is appropriate.

20

Applying this standard here, we conclude that a reasonable jury could find that Dal-Tile knew or should have known of the harassment. Here, Freeman presented evidence that Wrenn, her supervisor, knew of all three of the most major incidents: the two "black b****" comments, and the "f***ed up as a n****r's checkbook" comment. Wrenn was present for the first "black b****" comment, which Freeman complained about to Wrenn afterward. Freeman also complained to Wrenn specifically about the other two comments from Koester almost immediately after they occurred.[5] When Freeman complained to Wrenn about the "f***ed up as a n****r's checkbook" comment, Wrenn "scoffed and shook her head and put her head back down and continued on with trying to pick the nail polish off of her nails." J.A. 102. When Freeman complained about the second "black b****" comment, Wrenn simply rolled her eyes and went on talking to a co-worker. J.A. 112. In addition to these most severe incidents, Wrenn was also present the time Koester passed gas on Freeman's phone and Freeman began crying and had to leave the room.

Not only did Wrenn know of these specific and more severe incidents, but she also knew the harassment was an on-going situation. As discussed above, Wrenn herself testified that she

---

[5] Per the company's harassment policy, Freeman did exactly what she was supposed to by telling Wrenn, her supervisor, of the harassment. J.A. 199.

21

knew Koester used the word "b****" in the office frequently, that he made sexual comments in the office, that he showed pictures of naked women on his phone in the office, and that he "always made comments about women." J.A. 268–74. Wrenn herself referred to him as a "pig." J.A. 253. Cathy Diksa also testified that Wrenn knew Koester used "racial language" in the office. J.A. 217.

This evidence, if proven true, shows that Dal-Tile, through its agent Wrenn, had actual knowledge of the harassment and that Freeman found it offensive, as shown by Freeman's frequent complaints and her negative reaction to his behavior. However, even if Wrenn did not have actual knowledge that Freeman was offended by Koester's behavior, at the very least, she <u>should have</u> known it: Wrenn was aware of Koester's on-going inappropriate behavior and comments, had received several complaints about the harassing incidents from Freeman, had witnessed Freeman crying from the harassment, and knew incendiary terms like "n****r" and "black b****" had been used in the presence of a black, female employee. As stated above, "[a]n employer cannot avoid Title VII liability for coworker harassment by adopting a 'see no evil, hear no evil' strategy." <u>Ocheltree</u>, 335 F.3d at 334. Therefore, we conclude a reasonable jury could find that Dal-Tile knew, or at the very least, should have known, of Koester's harassment.

22

In addition, Freeman has at least created a triable issue of fact as to whether Dal-Tile's response to halt the harassment was adequate. Despite Wrenn's notice of Koester's on-going behavior, Dal-Tile did not take <u>any</u> effective action to halt the harassment until Freeman reported up the chain to Cathy Diksa in human resources after the final "black b****" comment.[6] At that point, the harassment had been ongoing for three years. Diksa originally told Freeman that Koester would be permanently banned from Dal-Tile. J.A. 121–22. However, the company lifted the ban and instead simply prohibited Koester from communicating with Freeman while still allowing him on the premises if he coordinated his meetings through Wrenn.

As stated above, once an employer has notice of harassment, it must "take prompt remedial action reasonably calculated to end the harassment." <u>Amirmokri</u>, 60 F.3d at 1131 (quoting <u>Katz</u>, 709 F.2d at 256) (internal quotation marks omitted). Not only did Dal-Tile fail to take any serious action for three years in spite of the long list of ongoing harassment by Koester, but particularly shocking to us is the fact Dal-Tile took absolutely no action when Koester passed gas on Freeman's phone and made Freeman cry in Wrenn's presence, nor when Freeman promptly

---

[6] Wrenn did tell Koester not to use inappropriate language after the first "black b****" comment, but that proved ineffective as the harassment continued for three more years.

23

complained to Wrenn that Koester had used the word "n****r" on the phone with her. Although the harassment eventually stopped after the communication ban was put into place, the harassment had continued unabated for three years prior to that. While a communication ban may have been an adequate response had it been put into place sooner, Dal-Tile's failure was in not responding promptly to the harassment. Based on this evidence, we believe a reasonable jury could conclude that Dal-Tile failed to take "prompt remedial action reasonably calculated to end the harassment."

In sum, we believe a reasonable fact-finder could find there was an objectively hostile work environment based on both race and sex and that Dal-Tile knew or should have known of the harassment and failed to adequately respond. We, therefore, reverse the district court's grant of summary judgment in favor of Dal-Tile on Freeman's racial and sexual hostile work environment claims under Title VII, as well as her racial hostile work environment claim under 42 U.S.C. § 1981, and we remand for further consideration in the district court.[7]

---

[7] The standard used to evaluate a racial hostile work environment claim under § 1981 is the same as the standard used under Title VII. Spriggs, 242 F. 3d at 184. Thus our analysis is the same for both racial hostile work environment claims here.

IV.

Freeman also appeals the district court's ruling that she was not constructively discharged under 42 U.S.C. § 1981.[8] An employee is considered constructively discharged "if an employer deliberately makes the working conditions intolerable in an effort to induce the employee to quit." Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 186-87 (4th Cir. 2004) (quoting Martin v. Cavalier Hotel Corp., 48 F.3d 1343, 1353-54 (4th Cir. 1995)) (internal quotation marks and citations omitted). Freeman must prove two elements to demonstrate constructive discharge: "(1) the deliberateness of [Dal-Tile's] actions, motivated by racial bias, and (2) the objective intolerability of the working conditions." Id. at 186-87.

Here, Freeman did not present sufficient evidence to create a question of fact as to whether Dal-Tile deliberately attempted to induce her to quit, nor that her working conditions at the time she resigned were objectively intolerable. Rather, the evidence shows that within weeks from returning from a two month medical leave, Freeman voluntarily resigned from her position. She had had no contact with Koester for months, nor had he even been in the building at the same time as her since she had

---

[8] Freeman brought her constructive discharge claim solely under 42 U.S.C. § 1981, and thus it is only based on racial discrimination.

25

returned from leave. Freeman presented no evidence that Koester's harassment was still creating an objectively hostile work environment at the time she resigned, nor that Dal-Tile was allowing him to harass her in a deliberate attempt to force her to quit. Therefore, we affirm the district court's grant of summary judgment to Dal-Tile on the constructive discharge claim.

V.

Finally, Freeman contends that the district court erred in awarding Dal-Tile summary judgment on the North Carolina common law obstruction of justice claim. Freeman argues that Dal-Tile should have put a litigation hold on all relevant emails beginning no later than when it received Freeman's complaint in November 2009, and maybe even as early as when she contacted human resources about the situation in August 2009.

In North Carolina, "acts which obstruct, impede or hinder public or legal justice . . . amount to the common law offense of obstructing justice." Blackburn v. Carbone, 703 S.E.2d 788, 794 (N.C. Ct. App. 2010) (quoting Henry v. Deen, 310 S.E.2d 326, 334 (N.C. 1984)). The offense requires proof that the defendant acted "willfully and with an intent to defraud." State v. Eastmen, 438 S.E.2d 460, 464 (N.C. Ct. App. 1994). In other words, North Carolina law requires that the defendant acted with the specific intent to obstruct justice, not just the general

26

intent to do the act which resulted in the obstruction. See Blackburn, 703 S.E.2d at 795 & n.6 ("[A]ny action intentionally undertaken by the defendant for the purpose of obstructing, impeding, or hindering the plaintiff's ability to seek and obtain a legal remedy will suffice to support a claim for common law obstruction of justice. . . . The necessity for showing an intentional act of misconduct by the defendant is delineated in a number of criminal obstruction of justice cases.").

Here, Freeman presented no evidence that Dal-Tile destroyed emails with the intent to hinder the litigation. Rather, they were destroyed pursuant to Dal-Tile's email retention policy. Therefore, we affirm the district court's holding that there is not a viable obstruction of justice claim under North Carolina common law.

VI.

In conclusion, we reverse the district court's grant of summary judgment in favor of Dal-Tile on the sexual and racial hostile work environment claims under Title VII, and the racial hostile work environment claim under § 1981, and we remand these claims for further consideration in the district court. We affirm the district court's grant of summary judgment in favor of Dal-Tile on the constructive discharge claim and the North Carolina obstruction of justice claim.

REVERSED IN PART, AFFIRMED IN PART, AND REMANDED

27

NIEMEYER, Circuit Judge, concurring in part and dissenting in part:

This case involves a workplace allegedly made hostile by the conduct of a customer of the employer. In recognizing that employers can be liable in cases where the harassing conduct was that of a third party, the majority extends the scope of Title VII beyond what the Supreme Court has so far recognized. I have grave concerns about such an extension when hostile work environment claims were themselves an extension of Title VII, which was designed to regulate the employer-employee relationship.

But even recognizing that there are some adventuresome cases concluding that an employer can be liable for its failure to take action to protect its employees from a third party's harassment, see, e.g., Dunn v. Wash. Cnty. Hosp., 429 F.3d 689, 691 (7th Cir. 2005), I conclude that the majority's opinion today goes so far that it cannot find support even in them. An employer in this kind of case may be liable at most for its own negligence in allowing the conduct of its customers to turn its workplace into a hostile work environment -- i.e., a work environment that, as a result of the customers' conduct, becomes "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [an employee's] employment." Harris v. Forklift

<u>Sys., Inc.</u>, 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted). As a negligence case, the analysis must focus on identifying when the employer knew or should have known that its employee was being subjected to harassment based on the employee's "race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a)(1), and then on evaluating the adequacy of the employer's response at that point. See <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 759 (1998).

In this case, the majority concludes that a reasonable jury could find Dal-Tile liable under Title VII for discriminating against Lori Freeman, its employee, because it permitted a Dal-Tile customer, Timothy Koester, to engage in continuous sex-based and race-based harassment of Freeman for three years. I believe, however, that a closer review of the record does not support that overly generalized conclusion.

The record only supports the inference that Koester's conduct rose to the level of actionable harassment in the summer of 2009. To be sure, Koester's conduct in the office prior to that point had been coarse, crude, and ugly. But there is insufficient evidence in the record to allow a reasonable jury to conclude that, prior to the summer of 2009, his conduct had created a hostile or abusive working environment for Freeman at Dal-Tile. In August 2006 (shortly after Freeman began her employment at Dal-Tile), Freeman did hear Koester use the phrase

29

"black bitches" in Dal-Tile's office when referring to a photograph of two former employees. But she also heard a Dal-Tile assistant manager, Sara Wrenn, immediately respond to Koester, directing him "not to use that language here." J.A. 76. And for nearly three years thereafter, Freeman "carried on a working relationship with [Koester]," describing herself as being "friendly with [him] as long as he wasn't making . . . lewd comments." J.A. 126. When Freeman thought Koester was behaving inappropriately, she would tell him to cut it out, just as her coworkers did. As Wrenn explained:

> [T]he minute [Freeman] started with [Dal-Tile], she fit right in with us. And, you know, everybody knew that [Koester] ran his mouth, and you know, like I said, it was never malice, it was never malicious. He was just crude, and everybody knew exactly how to handle him and put him in his place, and Lori [Freeman] fell right into that, and she had no problems calling him out . . . .

J.A. 292. Similarly, Freeman stated that she had a good working relationship with all of her coworkers, describing the office as "very close knit." J.A. 58. Thus, unlike the circumstances presented in EEOC v. Cent. Wholesalers, Inc., 573 F.3d 167, 170 (4th Cir. 2009), and Mosby-Grant v. City of Hagerstown, 630 F.3d 326, 330 (4th Cir. 2010), where the plaintiff-employees were surrounded by multiple individuals who regularly referred to women as "bitches" and engaged in other demeaning conduct, the

30

record here is clear that Koester was the outlier in an otherwise harmonious and harassment-free office environment.

A jury could find, however, that the circumstances for Freeman did change in the summer of 2009 when she reasonably began to perceive Koester's conduct as being so offensive as to make her work environment abusive. This is when Koester told Freeman that he was as "fucked up as a nigger's checkbook" and then, several weeks later, called her a "black bitch." But it was also at this point that Dal-Tile intervened to protect Freeman. The day after Koester made the "black bitch" comment to Freeman, Dal-Tile told Koester that he was suspended from the premises. And while Dal-Tile eventually agreed to conduct business with Koester again, it was only with restrictions in place that ensured that Freeman would not have to interact with him. Indeed, Koester never made another inappropriate remark in Freeman's presence.

This is not a case where an employer knew that its employee was experiencing actionable harassment but did nothing in response. Rather, the record shows that Dal-Tile did indeed intervene and intervened effectively. I would accordingly affirm the district court's summary judgment in favor of Dal-Tile on all of Freeman's claims, including her hostile work environment claims.