**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 20-2361

TONYA R. CHAPMAN,

Plaintiff – Appellant,

v.

OAKLAND LIVING CENTER, INC.; ARLENE SMITH; MICHAEL SMITH; STEVE SMITH,

Defendants – Appellees.

------------------------------

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

Amicus Supporting Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Asheville.  Martin K. Reidinger, Chief District Judge.  (1:18-cv-00345-MR-WCM)

Argued:  December 9, 2021                    Decided:  August 30, 2022

Before KING and WYNN, Circuit Judges, and KEENAN, Senior Circuit Judge.

Vacated and remanded by published opinion.  Judge King wrote the opinion, in which Judge Wynn and Senior Judge Keenan joined.

**ARGUED:** Kimberly Veklerov, Gregory Eng, UNIVERSITY OF VIRGINIA SCHOOL OF LAW, Charlottesville, Virginia, for Appellant. Jonathan Woodward Yarbrough, CONSTANGY, BROOKS, SMITH & PROPHETE, LLP, Asheville, North Carolina, for Appellees. Jeremy Daniel Horowitz, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Curiae. **ON BRIEF:** J. Scott Ballenger, Jennifer Elchisak, Third Year Law Student, Zev Klein, Third Year Law Student, Jehanne McCullough, Third Year Law Student, Carly Wasserman, Third Year Law Student, Appellate Litigation Clinic, UNIVERSITY OF VIRGINIA SCHOOL OF LAW, Charlottesville, Virginia, for Appellant. Jill S. Stricklin, CONSTANGY, BROOKS, SMITH & PROPHETE, LLP, Winston-Salem, North Carolina, for Appellees. Gwendolyn Young Reams, Acting General Counsel, Jennifer S. Goldstein, Associate General Counsel, Sydney A.R. Foster, Assistant General Counsel, Anne W. King, Appellate Litigation Services, Office of General Counsel, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Curiae.

---

KING, Circuit Judge:

Tonya R. Chapman, the Black plaintiff in this civil rights action on appeal from the Western District of North Carolina, alleges that she was subjected to multiple instances of racial harassment and other discrimination during two periods of employment with the defendant Oakland Living Center, Inc. ("OLC"). According to Chapman, she was compelled to resign for good in the summer of 2018 after repeatedly being called a "n*****" by the six-year-old son of an OLC supervisor, defendant Steve Smith, and grandson of OLC's owners, defendants Arlene Smith and Michael Smith.[1] In this appeal, Chapman contests the district court's award of summary judgment to OLC on her hostile work environment and constructive discharge claims under both Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. *See Chapman v. Oakland Living Ctr., Inc.*, No. 1:18-cv-00345 (W.D.N.C. Nov. 24, 2020), ECF No. 64 (the "Order"). As explained herein, we vacate the judgment and remand for further proceedings on the claims against OLC.[2]

---

[1] We have sanitized the racial epithet repeatedly hurled at Chapman by replacing that atrocious term with "n*****" and the "n-word." In so doing, we do not mean to diminish the impact of that slur.

[2] By its Order, the district court also awarded summary judgment to Arlene, Michael, and Steve Smith on § 1981 claims lodged against them in their individual capacities. Although Chapman designated each of the Smiths as an appellee, she does not ask this Court to reinstate those claims.

I.

A.

The record reflects that OLC, owned by Arlene and Michael Smith, operates an assisted living facility in Rutherfordton, North Carolina. During the summer of 2018, Arlene and Michael's son Steve Smith served as a supervisor at the facility while training to take over his parents' business. Three of Steve's sons (Arlene and Michael's grandsons) — the six-year-old boy who called Chapman the n-word and his older twin brothers — were regularly present at the facility. The Smiths are white.

During her first period of employment with OLC, from 2004 to 2015, Chapman had worked as a housekeeper, cook, and personal care aide at the assisted living facility. According to Chapman, she experienced racial harassment and other discrimination perpetrated by members of the Smith family in that 11-year span. The alleged discrimination included the following:

- In 2009 or 2010 when photographing Chapman for an employee identification badge, Arlene Smith insisted on shooting Chapman from both the front and the side (unlike other employees only photographed from the front), commented "I'm going to take a picture of you from the side and I'm going to give you some slave numbers," and then wrote the so-called "slave numbers" on Chapman's badge (the "badge incident"), *see* J.A. 52;[3]

- In 2012 or 2013, Chapman overheard Arlene's teenage niece, who was then employed by OLC as a "med tech," tell another employee that Arlene and Michael Smith "had to buy another condo because there were too many blacks at Myrtle Beach" (the "condo comment"), *see id.* at 84;

_____

[3] Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.

4

- In February 2014, on the birthday Chapman shared with Steve Smith's twin sons, Chapman had to clear the facility's dining room for a monkey-themed birthday party for the twins, and then Steve and his wife gave Chapman a cake arguably depicting a Black figure hanging from a noose and told her to leave so the children could enjoy the party (the "birthday incident"); and

- Despite Chapman's repeated requests for support to advance at the facility by obtaining a med tech license, Arlene never gave Chapman or any other Black employee such support, finally prompting Chapman to quit (the "lack-of-advancement issue").

An OLC employee named Patricia Warner contacted Chapman in 2018 and persuaded her to return to work at the assisted living facility. Chapman then resumed employment with OLC, as a weekend cook. Although OLC denies that Warner was Chapman's supervisor in the kitchen, Chapman understood Warner to have that role, with the authority to set Chapman's schedule, give instructions for meal preparation, and recommend employee discipline to Arlene and Michael Smith. Higher-level supervision was provided by Steve Smith, who had not been working for his parents' business during Chapman's first period of employment with OLC.

One day in July 2018, Chapman was preparing cupcakes for the assisted living facility's residents and set some aside for Steve Smith's sons to decorate. Chapman knew without being told that the boys would spend time in the kitchen that day because they were at the facility "all the time" and "always in the kitchen with [her]." *See* J.A. 62, 64. When the six-year-old boy finished decorating his cupcakes and Chapman refused to give him more, he hit and kicked Chapman and told her, "My daddy called you a lazy ass black n*****, because you didn't come to work." *Id.* at 67 (the "July 2018 n-word incident").

5

Chapman's evidence is that she reported the July 2018 n-word incident to Warner the next day but did not say anything about it to Steve, Arlene, or Michael Smith. Chapman explained that Arlene and Michael were absent from the facility that day, and that she opted to report the incident to Warner as an intermediary rather than to Steve directly because she "figured it probably would sound better coming from, you know, another [supervisor]." *Id.* at 70. Warner apparently did not, however, share Chapman's report of the July 2018 n-word incident with any of the Smiths.

On August 24, 2018, at the beginning of Chapman's shift at the assisted living facility, the same six-year-old boy called for Chapman to come outside and watch him do tricks on his bicycle. She did, but the boy was soon summoned by his father, allowing Chapman to return inside and clean up the dining room. A short time later, the boy came to a window and yelled for Chapman by her first name, "Tonya." *See* J.A. 76. She opened the window and told the boy that she had to work. In response, the boy said, "N*****, n*****. Get to work, n*****." *Id.* (the "first August 2018 n-word incident"). Chapman promptly reported the first August 2018 n-word incident to Warner.

At the time of the first August 2018 n-word incident, Arlene and Michael Smith were out of town. Steve Smith was present at the assisted living facility, learned from Warner what his son said, and then confirmed it with Chapman. Shortly thereafter, Steve brought the boy into the facility's kitchen to apologize, pushing him toward Chapman. The boy refused to approach Chapman and instead ran to Warner and cried. Steve then exited the kitchen, without eliciting an apology from the boy or offering his own apology. Rather than taking his son with him, Steve left the boy with Chapman and Warner. Thereafter,

6

the boy said to Chapman in Warner's presence, "Tonya, you are a n*****." *Id.* at 79 (the "second August 2018 n-word incident"). Following the second August 2018 n-word incident, Chapman finished washing dishes and then left the facility without completing her shift, telling Warner, "I've got to go. I can't stay here. I can't. I'm sorry. [Six] year olds should not know that." *Id.* at 81. As Chapman departed, one of Steve's twin sons asked Chapman where she was going. Chapman responded, "I've got to go. I can't stay. I can't stay." *Id.* at 82. Chapman never again worked for OLC.

According to Steve Smith, he had spanked his six-year-old son in the assisted living facility's parking lot before bringing him to the kitchen to apologize to Chapman. For her part, Chapman did not witness the purported spanking. She also surmised that any punishment Steve might have imposed "couldn't have been too bad for [the boy] to come back in there and say it again." *See* J.A. 80.

Arlene Smith has since acknowledged that, although OLC had an employee handbook during Chapman's employment, there was only one copy and that copy was kept at the assisted living facility's front desk. Arlene did not know whether Chapman had reviewed the lone copy of the employee handbook. Moreover, Arlene could not recall whether the employee handbook contained a policy for reporting harassment, and OLC has not produced evidence of any such policy.

### B.

On September 26, 2018, Chapman filed a charge of discrimination against OLC with the Equal Employment Opportunity Commission (the "EEOC"), alleging race discrimination based on the three n-word incidents. Chapman specified in her EEOC

7

charge that the alleged discrimination was limited to July and August 2018. She referred therein to Steve Smith as "my supervisor" and Warner as a "co-worker." *See* J.A. 100. With respect to the July 2018 n-word incident, Chapman asserted that in response to being called a "n*****" by Steve's son, "I told [the boy] to stop, but I did not report it." *Id.* Chapman further relayed that Steve was immediately made aware of the first August 2018 n-word incident by Warner and promised "he would take care of it," but he failed to prevent the second August 2018 n-word incident that quickly followed. *Id.* In Chapman's words, she then "left work and did not return because of the treatment." *Id.*

Notably, Chapman did not check the box in her EEOC charge for a "continuing action," mention her earlier period of employment with OLC from 2004 to 2015, or indicate that any additional racial harassment or other discrimination (such as the badge incident, the condo comment, the birthday incident, or the lack-of-advancement issue) occurred during that time span. The EEOC issued Chapman a right-to-sue letter on September 28, 2018.

### C.

Proceeding pro se, Chapman initiated this civil rights action in the Western District of North Carolina on December 3, 2018. Subsequently retained counsel filed the operative Amended Complaint of April 1, 2020. Relevant here, the Amended Complaint alleges the claims against OLC — for a hostile work environment and constructive discharge — under both Title VII and 42 U.S.C. § 1981. The Amended Complaint premises those claims not only on the three n-word incidents that occurred during Chapman's employment with OLC

8

in the summer of 2018, but also additional incidents of racial harassment and other discrimination dating to her earlier period of employment from 2004 to 2015.

OLC filed its motion for summary judgment on September 3, 2020. A few days later, on September 9, 2020, Chapman's counsel was granted permission to withdraw from representation, leaving Chapman without a lawyer in the summary judgment proceedings. Chapman filed pro se responses to OLC's summary judgment motion and appeared pro se at a motion hearing conducted by the district court on October 23, 2020.

By its Order of November 24, 2020, the district court awarded summary judgment to OLC on Chapman's hostile work environment and constructive discharge claims. As further discussed below, the court concluded that it could consider only the evidence of the three n-word incidents that occurred in 2018 — and not the racial harassment and other discrimination allegedly perpetrated against Chapman during her earlier period of employment. In the court's view, the evidence of the three n-word incidents failed to engender a factual dispute meriting a jury trial and OLC was entitled to judgment as a matter of law.

Chapman timely noted this appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291. On appeal, Chapman is represented by pro bono counsel from the University of Virginia School of Law. Additionally, the EEOC filed an amicus curiae brief on Chapman's behalf and participated in the oral argument.

9

II.

We review de novo a district court's award of summary judgment, viewing the facts in the light most favorable to the non-moving party. *See Walker v. Donahoe*, 3 F.4th 676, 682 (4th Cir. 2021). Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a).

III.

In our analysis, we first conclude that the district court erred in awarding summary judgment to OLC on Chapman's hostile work environment claim, considering just the three n-word incidents. We next rule that the court erred by granting OLC summary judgment on Chapman's constructive discharge claim, also based on the three n-word incidents alone. Finally, we recognize that the court was wrong to exclude any consideration of the racial harassment and other discrimination allegedly perpetrated against Chapman during her earlier period of employment. On those bases, we vacate the court's judgment and remand for further proceedings on the claims against OLC.

A.

We begin with Chapman's hostile work environment claim against OLC, considering only the three n-word incidents at this point in our discussion. The elements of a hostile work environment claim are the same under Title VII and 42 U.S.C. § 1981. *See Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (en banc). Specifically, the "plaintiff must show that there is (1) unwelcome conduct; (2) that is based

10

on the plaintiff's race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Id.* (alteration and internal quotation marks omitted).

1.

In addressing Chapman's hostile work environment claim, the district court focused on the fourth element — whether the three n-word incidents perpetrated by Steve Smith's six-year-old son are imputable to OLC — because that is the only element that OLC argued is not satisfied. *See* Order 8. Nevertheless, the court made remarks pertinent to the third element, i.e., whether the three n-word incidents amount to conduct that is sufficiently severe or pervasive to alter Chapman's conditions of employment and create an abusive work environment. Specifically, the court observed "that the child used atrocious language that is entirely unacceptable in society"; that "[t]here is no question that 'the word "n****r" is pure anathema to African-Americans, as it should be to everyone'"; and that Chapman "certainly did not and does not deserve to be called that epithet or any other epithet by a six-year-old child or by anyone else at her place of employment or anywhere else." *Id.* at 12 (quoting *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 422 (4th Cir. 2014)).

Rejecting Chapman's hostile work environment claim on the fourth element, the district court concluded that the three n-word incidents are not imputable to OLC. *See* Order 8-12. The court applied the standard for cases in which the alleged harasser is a third party. *Id.* at 8-9. Under that standard — which is a negligence standard similar to that utilized when the harasser is the victim's mere co-worker (rather than a supervisor) — an employer is liable for a third party "creating a hostile work environment if the employer

11

knew or should have known of the harassment and failed to take prompt remedial action reasonably calculated to end the harassment." *See Freeman*, 750 F.3d at 423 (internal quotation marks omitted).

With respect to the July 2018 n-word incident, the district court faulted Chapman for not reporting that "incident to a supervisor or anyone that could have reprimanded the child or corrected the situation." *See* Order 10. The court declined to conclude otherwise based on Chapman's evidence that she reported the incident to Patricia Warner. *Id.* at 10 n.3. First, the court deemed that evidence to be inconsistent with Chapman's EEOC charge, in which she stated that in response to the July 2018 n-word incident, "I told [the boy] to stop, but I did not report it." *See* J.A. 100; *see also* Order 10 n.3 (relating that, in her EEOC charge, Chapman "asserted that she did not report this incident"). Second, the court concluded that any report to Warner "does not suffice for evidence of notice to a supervisor" because "Warner was not [Chapman's] supervisor as the term is defined for discrimination claims." *See* Order 10 n.3. The district court relied on *Vance v. Ball State University*, wherein the Supreme Court defined "supervisor" for the purpose of imputing a supervisor's harassment to the employer. *See* 570 U.S. 421, 431 (2013) (holding "that an employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim," such as hiring and firing).

Turning to the first August 2018 n-word incident, the district court ruled that "[t]he uncontroverted evidence is that as soon as Steve Smith was alerted that the child directed a racial slur at [Chapman], he punished the child." *See* Order 10. As for the second August

12

2018 n-word incident, the court faulted Chapman for "resign[ing] before reporting this incident, thus giving OLC no opportunity to react." *Id.* The court did not blame Steve for failing to prevent the second August 2018 n-word incident by inadequately punishing his son for the first, observing that "[a]n employer's remedial actions must be 'reasonably likely to stop the harassment,' but need not be guaranteed to stop the harassment." *Id.* at 10-11 (quoting *EEOC v. Xerxes Corp.*, 639 F.3d 658, 674 (4th Cir. 2011)). The court elaborated:

> Spanking the child after the [first August 2018 n-word incident] may not have stopped the harassment in this case, but it was an effort directed to reasonably stop the harassment. [Chapman] offers no suggestion as to what additional punishment should have been directed toward the child to be more effective other than indicating that Steve Smith should not have left the child in the kitchen to "say it again." After the second [August 2018 n-word] incident, when Steve Smith would have learned of the insufficiency of his discipline, more stringent measures could have been taken, such as keeping the child at home. But [Chapman] did not give [OLC] the opportunity, as she immediately quit.

*Id.* at 11 (citation omitted). Summarizing its ruling on the fourth element of Chapman's hostile work environment claim, the court related that Chapman "has not set forth evidence to create a genuine issue of material fact supporting the claim that the child's actions should be attributed to OLC as a matter of law," thereby entitling OLC to the award of summary judgment. *Id.* at 12.

2.

a.

Although OLC raised only a fourth-element challenge to Chapman's hostile work environment claim in the district court, OLC now contends on appeal, relevant to the third

element, that the three n-word incidents are insufficiently severe or pervasive to alter Chapman's conditions of employment and create an abusive work environment. Because Chapman has replied to the merits of that argument — and has not complained that it was forfeited — we address it. *But see Muth v. United States*, 1 F.3d 246, 250 (4th Cir. 1993) (observing that "issues raised for the first time on appeal generally will not be considered").[4]

As we have explained, the third element of a hostile work environment claim "requires a showing that the environment would reasonably be perceived, and is perceived, as hostile or abusive." *See Boyer-Liberto*, 786 F.3d at 277 (internal quotation marks omitted). "Whether the environment is objectively hostile or abusive is judged from the perspective of a reasonable person in the plaintiff's position." *Id.* (internal quotation marks omitted).[5] That assessment "is made by looking at all the circumstances." *Id.* (internal quotation marks omitted).

OLC would have us distinguish this case from those, such as *Boyer-Liberto*, where we have recognized that even a single use of the n-word or a similar racial slur by a supervisor can engender a hostile work environment. *See, e.g.*, *Boyer-Liberto*, 786 F.3d at

---

[4] Meanwhile, OLC asserts on appeal that Chapman forfeited most of her appellate arguments by failing to raise them — pro se — in the district court. We have considered OLC's assertions of forfeiture and roundly reject them.

[5] In its amicus brief, the EEOC asks us to "follow the approach of other circuits that examine whether the harassment in question would be perceived as severe or pervasive by a reasonable person *of the same protected class*." *See* EEOC Amicus Br. 11-12 (internal quotation marks omitted). We need not consider today whether that is the appropriate standard, however, as applying it would not change the outcome of this appeal.

14

280 (recognizing that an alleged supervisor's "two uses of the 'porch monkey' epithet — whether viewed as a single incident or as a pair of discrete instances of harassment — were severe enough to engender a hostile work environment"). According to OLC, the repeated use of the n-word here is not objectively severe because it "was uttered by a young child." *See* Br. of Appellees 46.

As Chapman counters, however, the boy who uttered the slurs was not just any "young child," but the grandson of OLC's owners and the son of a supervisor being groomed to take over the family business. *See* Reply Br. of Appellant 18 ("OLC wants to emphasize the fact that these words came from a child, while ignoring *whose child he was*."). Thus, a reasonable person in Chapman's position could "fear that the child had his relatives' ear and could make life difficult for her." *Id.*; *cf. Boyer-Liberto*, 786 F.3d at 279 (deeming it relevant to the third element inquiry that the harasser had "repeatedly and effectively communicated to [the victim that the harasser] had [the employer's] ear and could have [the victim] fired").

Moreover, in the July 2018 n-word incident, the boy directly attributed the slur to his father, along with a negative commentary on Chapman's work performance. As the boy put it, "My daddy called you a lazy ass black n*****, because you didn't come to work." *See* J.A. 67. Whether or not the boy was being truthful, the invocation of his father can reasonably be seen as further amplifying the severity of the boy's comment to Chapman. Additionally, the comment combined "the most egregious of all racial insults" (the n-word) with "a vile stereotype . . . dating back to chattel slavery" (being lazy). *See* Reply Br. of Appellant 20.

15

Simply put, a reasonable person in Chapman's position could perceive a "tremendous difference between an insult from (say) a customer's six-year-old child and the powerful statement from a supervisor's son that 'My daddy called you a lazy ass black n*****, because you didn't come to work.'" *See* Reply Br. of Appellant 18 (quoting J.A. 67). And the harassment did not stop there. A short time later, in the first and second August 2018 n-word incidents, the same boy hurled the n-word at Chapman several more times and told her to "[g]et to work." *See* J.A. 76, 79.

Notably, it matters not if the boy was too young to understand the force of his words or if he lacked intent to harm Chapman, for "harassment based on a protected characteristic may be actionable where it 'has the purpose or *effect* of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.'" *See* EEOC Amicus Br. 13-14 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)). Indeed, a reasonable person in Chapman's position could perceive the boy's comments to be "especially humiliating" because of his young age, and his "constant presence in the [assisted living facility's] kitchen" to pose a threat "that another incident could occur at any time." *Id.* at 18-19 (internal quotation marks omitted).

Considering all of the foregoing circumstances, the fact that the three n-word incidents were perpetrated by a six-year-old boy does not preclude a finding that those incidents are sufficiently severe or pervasive to alter Chapman's conditions of employment and create an abusive work environment. Accordingly, we reject OLC's contention that it is entitled to summary judgment for lack of an adequate showing on the third element of Chapman's hostile work environment claim.

16

b.

With respect to the fourth element of Chapman's hostile work environment claim, the issue is whether the three n-word incidents are imputable to OLC. The district court applied an appropriate standard, under which an employer is liable for a third party "creating a hostile work environment if the employer knew or should have known of the harassment and failed to take prompt remedial action reasonably calculated to end the harassment." *See Freeman*, 750 F.3d at 423 (internal quotation marks omitted) (adopting standard for third-party harassment similar to standard for co-worker harassment). The court went on to err, however, in its fourth-element analysis.

(1)

Significantly, the district court addressed only whether OLC had actual knowledge of the six-year-old boy's racial slurs against Chapman, without considering whether OLC had constructive knowledge of that harassment. As we have emphasized, "an employer cannot avoid Title VII liability for [third-party] harassment by adopting a 'see no evil, hear no evil' strategy." *See Freeman*, 750 F.3d at 423 (alteration in original) (quoting *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 334 (4th Cir. 2003) (en banc)). Thus, "[k]nowledge of harassment can be imputed to an employer if a reasonable person, intent on complying with Title VII, would have known about the harassment." *See Ocheltree*, 335 F.3d at 334 (alteration and internal quotation marks omitted). "Under this rule an employer may be charged with constructive knowledge of [third-party] harassment when it fails to provide reasonable procedures for victims to register complaints." *Id.*

17

Here, the record indicates that OLC failed to provide reasonable procedures for complaints of workplace harassment. OLC has produced no evidence that it had any harassment reporting policy in July and August 2018, when the three n-word incidents occurred. Moreover, Arlene Smith has related that although OLC had some sort of employee handbook during Chapman's employment, there was only one copy and that copy was kept at the assisted living facility's front desk where Chapman may never have seen it. In these circumstances, a reasonable jury could charge OLC with constructive knowledge of all three n-word incidents.

(2)

On the issue of OLC's actual knowledge of the July 2018 n-word incident, the district court rejected Chapman's contention that she informed OLC of the incident by reporting it to Patricia Warner, who Chapman said she understood to be her supervisor in the assisted living facility's kitchen. We have recognized that a reasonable jury could find that an employer had notice of harassment where the victim complained to her supervisor. *See EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 319 (4th Cir. 2008).

Nonetheless, the district court disregarded Chapman's evidence of her report to Warner for being inconsistent with the statement in her EEOC charge that in response to the July 2018 n-word incident, "I told [the boy] to stop, but I did not report it." *See* J.A. 100. In other words, the court construed the EEOC charge to mean that Chapman did not report the incident to anyone. We see a feasible and more generous interpretation of the EEOC charge: that Chapman meant she did not report the July 2018 n-word incident to Arlene, Michael, or Steve Smith. Such an interpretation is consistent with the evidence

18

herein that Arlene and Michael were absent from the assisted living facility at the relevant time, and that Chapman opted to report the incident to Warner as an intermediary rather than to Steve directly because she "figured it probably would sound better coming from, you know, another [supervisor]." *Id.* at 70. The competing interpretations of the EEOC charge present a credibility determination for a jury, not a reason to refuse to consider Chapman's evidence of her report to Warner.

Additionally, the district court concluded that any report to Warner could not serve as notice to OLC of the July 2018 n-word incident because Warner does not qualify as a "supervisor" as that term was defined by the Supreme Court in *Vance*. *See* 570 U.S. at 431 (describing a "supervisor" as an employee empowered to hire, fire, or take other tangible employment actions). Although the district court suggested that the *Vance* definition extends to all discrimination claims, the Supreme Court actually devised it for the limited purpose of imposing vicarious liability against an employer for harassment perpetrated by a supervisor. *See id.* at 423 (explaining that the Court was deciding the open question of "who qualifies as a 'supervisor' in a case in which an employee asserts a Title VII claim for workplace harassment").

Accordingly, the relevant question is not whether Warner qualifies as a "supervisor" under *Vance*. Rather, the proper question is whether Warner's position at OLC — whatever it is labelled — would allow a reasonable jury to find that OLC knew or should have known of the July 2018 n-word incident as a result of Chapman's report of that incident to Warner. *See, e.g.*, *Freeman*, 750 F.3d at 423 (ruling "that a reasonable jury could find that [the employer] knew or should have known of the harassment" based on

the victim's evidence that her supervisor "knew of all three of the most major incidents");

*Howard v. Winter*, 446 F.3d 559, 569 (4th Cir. 2006) (concluding "that a reasonable trier

of fact could find that [the victim's] conversation with [a senior human resources official

who did not supervise the victim] was sufficient to place the [employer] on notice of [the

harasser's] behavior"). That question is yet unanswered.

(3)

Regarding OLC's actual knowledge of the subsequent harassment, the district court

determined that Steve Smith was immediately alerted and appropriately responded to the

first August 2018 n-word incident, and that Chapman's abrupt resignation deprived OLC

of an opportunity to learn of and deal with the second August 2018 n-word incident. In

thereby relieving OLC of liability, the court relied on our precedent recognizing that "Title

VII requires only that the employer take steps reasonably likely to stop the harassment."

*See Xerxes Corp.*, 639 F.3d at 674 (internal quotation marks omitted). Under that

precedent, "it is possible that an action that proves to be ineffective in stopping the

harassment may nevertheless be found reasonably calculated to prevent future harassment

and therefore adequate as a matter of law." *Id.* at 670 (alteration and internal quotation

marks omitted).

Unlike the district court, we discern a genuine dispute of fact as to whether Steve

Smith's response to the first August 2018 n-word incident — spanking his young son,

dragging the boy to the assisted living facility's kitchen to apologize to Chapman, and then

abruptly leaving the boy crying and recalcitrant with Chapman and Warner, without even

offering his own apology — was reasonably calculated to prevent further harassment. That

20

is, "[a] reasonable trier of fact could conclude that leaving a distressed six-year-old child, who has just been making racist comments, alone in the workplace with the victim and target of those comments certainly is not action 'reasonably calculated' to stop the harassment or to repair the working environment." *See* Br. of Appellant 23. To be sure, we have found a jury issue where an employer's response to reports of workplace harassment was far more robust. *See, e.g.*, *EEOC v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 177 (4th Cir. 2009) (concluding that although the employer "took a number of steps" to curb alleged harassment, including conducting investigations, holding meetings with the victim and her harassers, and having an anti-discrimination policy in place, its "response was not without its apparent shortcomings").

"Of course," as we have explained, "the reasonableness of [OLC's] actions depends, in part, on the seriousness of the underlying conduct." *See Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 498 (4th Cir. 2015). Furthermore, it is significant — though not dispositive of the adequacy of Steve Smith's response — that the response proved ineffective and that the second August 2018 n-word incident quickly followed the first. *Id.* at 499 (recognizing that "the effectiveness of an employer's actions remains a factor in evaluating the reasonableness of the response").

Finally, a jury could also be swayed by this point made by Chapman: that Steve Smith's "response would have been inadequate even if the child had apologized." *See* Br. of Appellant 24. As Chapman has cogently asserted,

> [s]urely an employee in Ms. Chapman's position is owed more from her employer than a coerced apology delivered by a six year old child. An apology would have left two questions entirely unaddressed: first, how the

21

child developed these racial attitudes and the shockingly specific view that Ms. Chapman was a "lazy ass black n*****" who "didn't come to work," and second, whether the child would remain a constant presence in the workplace.  A serious and appropriate response to an incident of this severity would have required a real reckoning with how it happened, how OLC would prevent it from recurring, and how Ms. Chapman's confidence in the integrity of her workplace and her primary supervisor could be restored.

*Id.* at 24-25 (quoting J.A. 67).

\* \* \*

At bottom, in assessing the fourth element of Chapman's hostile work environment claim, a reasonable jury could find that OLC had either or both constructive and actual knowledge of the three n-word incidents and that its response was insufficient.  We therefore vacate the district court's award of summary judgment on the hostile work environment claim and remand for further proceedings.[6]

B.

We next address Chapman's constructive discharge claim, still considering only the three n-word incidents.  This Court's standard for constructive discharge once required a showing that the "employer deliberately ma[de] the working conditions intolerable in an effort to induce the employee to quit."  *See Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 186 (4th Cir. 2004) (internal quotation marks omitted).  Under that standard, the plaintiff had to "allege and prove two elements:  (1) the deliberateness of [the employer's]

---

[6] On remand, the district court may consider an alternative theory of liability advanced by Chapman with respect to her hostile work environment claim:  "that OLC is vicariously liable because the harassment that Ms. Chapman experienced was aided by OLC's agency relationship with [Steve Smith]."  *See* Br. of Appellant 29.  We do not unnecessarily consider that theory today.

actions, motivated by racial bias, and (2) the objective intolerability of the working conditions." *Id.* at 187.

Critically, however, "as a result of intervening Supreme Court case law, 'deliberateness' is no longer a component of a constructive discharge claim." *See EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 144 (4th Cir. 2017) (citing *Green v. Brennan*, 578 U.S. 547 (2016)). That is, "[t]he Supreme Court now has clearly articulated the standard for constructive discharge, requiring objective 'intolerability' — 'circumstances of discrimination so intolerable that a reasonable person would resign' — but not 'deliberateness,' or a subjective intent to force a resignation." *Id.* (quoting *Green*, 578 U.S. at 560).

Here, the district court erroneously applied the old standard and rejected Chapman's constructive discharge claim for failure to "present sufficient evidence to create a question of fact as to whether OLC deliberately attempted to induce her to resign." *See* Order 12-13. Consequently, we vacate the court's award of summary judgment to OLC on the constructive discharge claim and remand for a reassessment of that claim under the proper standard, which does not require a showing of "deliberateness." In so doing, we decline OLC's request to affirm the summary judgment award on the alternative ground — not yet passed on by the district court — that Chapman has failed to establish "intolerability."

C.

We lastly confront Chapman's evidence of racial harassment and other discrimination allegedly perpetrated against her during her first period of employment with OLC, from 2004 to 2015. That evidence includes the previously-defined badge incident,

23

condo comment, birthday incident, and lack-of-advancement issue. Although the Amended Complaint premises Chapman's hostile work environment and constructive discharge claims on both the three n-word incidents and the 2004-2015 evidence, the district court excluded the 2004-2015 evidence from its analysis of those claims. Instead, the court treated the 2004-2015 evidence — particularly the badge incident and the birthday incident — as being the basis for separate and additional hostile work environment claims under Title VII and § 1981. *See* Order 13-14.

From there, the district court ruled that Chapman could not pursue a Title VII claim premised on the badge or birthday incident because she had not mentioned those incidents or even her earlier period of employment in her EEOC charge. *See* Order 14-15. The court relied on our decisions including *Chacko v. Patuxent Institution*, wherein we recognized that "[i]f the claims raised under Title VII exceed the scope of the EEOC charge and any charges that would naturally have arisen from an investigation thereof, they are procedurally barred." *See* 429 F.3d 505, 509 (4th Cir. 2005) (internal quotation marks omitted).

The district court further ruled that any § 1981 claim based on the badge or birthday incident was barred under the applicable four-year statute of limitations. *See* Order 15; *see also Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 223 (4th Cir. 2016) ("Hostile work environment claims under § 1981 are subject to a four year limitation period."). The court recognized that "hostile work environment claims under Title VII [and Section 1981] are also subject to the 'continuing violation' theory for establishing limitations periods," *see* Order 15 (alteration in original) (quoting *Guessous*, 828 F.3d at 223), but deemed that

24

of no help to Chapman because the badge and birthday incidents "were in an entirely different period of employment and are, therefore, not part of the same actionable hostile work environment," *id.* (internal quotation marks omitted).

As Chapman emphasizes in this appeal, whether or not the district court properly disallowed separate and additional hostile work environment claims premised only on the 2004-2015 evidence, the court erred in excluding any consideration of the 2004-2015 evidence as part of the hostile work environment and constructive discharge claims involving the three n-word incidents that occurred in 2018. And that consideration does not depend on the "continuing violation" theory.

Rather, under Supreme Court precedent, Chapman is entitled to "us[e] the prior acts as background evidence in support of [her] timely claim[s]." *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). Thus, notwithstanding the district court's rulings, the trier of fact "would still be entitled to consider [the 2004-2015 evidence] to assess witness credibility and to decide other issues, such as whether OLC had notice of the environment and whether it would be reasonable to expect Ms. Chapman to pursue further complaints for the 2018 incidents." *See* Br. of Appellant 21. For example, the jury could conclude that "a reasonable person in Chapman's position could have perceived past discriminatory incidents involving the child's grandparents and parents as confirmation that challenging the [three n-word incidents] could lead to unwelcome consequences." *See* EEOC Amicus Br. 17. The jury also "could conclude that viewing the child's conduct through the lens of his family members' prior actions rendered the [three n-word] incidents more severe." *Id.*

25

In these circumstances, due consideration must be given on remand to the racial harassment and other discrimination allegedly perpetrated against Chapman during her earlier period of employment. At minimum, it is relevant background evidence in support of the hostile work environment and constructive discharge claims premised on the three n-word incidents.

## IV.

Pursuant to the foregoing, we vacate the judgment of the district court and remand for such other and further proceedings as may be appropriate.

*VACATED AND REMANDED*